**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. TDC-20-33** |
| | * | |
| **WILLIAM GARFIELD BILBROUGH IV,** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| ******* | | |

## OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER

The defendant asks this Court to set aside Magistrate Judge Sullivan's reasoned determination that the defendant must be detained based on danger to the community and flight risk. The defendant's motion should be denied, without a hearing.

## Background

On January 16, 2020, the defendant was arrested pursuant to a federal criminal complaint, which charged him with various alien-related offenses. The Government sought a detention hearing, and in support offered two photographs of the defendant firing weapons in a propaganda video for The Base. *See* Case No. 20-mj-194-CBD, ECF No. 9; **Exhibit A** (Exhibits 1 and 2 from initial appearance). Based on the Government's proffer and exhibits, Magistrate Judge Day temporarily detained the defendant pending a detention hearing. *See* Case No. 20-mj-194-CBD, ECF No. 8.

In a motion and at a detention hearing on January 22, 2020, the Government set forth substantial evidence in favor of detention. *See* Case No. 20-mj-194-CBD, ECF Nos. 12 & 15; **Exhibit B** (Exhibits 1 through 7 from detention hearing). The Government introduced as exhibits photographs (obtained through a court-authorized search of the defendant's phone) of the

defendant performing the Nazi salute while preparing to sacrifice a goat with other members of The Base at a training camp in Georgia, as well as a photograph of the severed head of the goat. *See* **Exhibit B** (Exhibits 1 through 3). Text messages from the defendant's phone also showed that, in November 2016, Bilbrough and co-defendant Brian Mark Lemley, Jr., discussed ways that Lemley could take his minor child from the child's custodian, in order to bring the child to Ukraine while Lemley fought in or alongside the Ukrainian army. Bilbrough told Lemley, "I have pretty quick and easy access to stuff like coke, heroin, or whatever else," and suggested that Lemley drug the child's custodian in order to get the child quickly while exacting untraceable revenge on the custodian for past grievances. In this conversation, when Lemley suggested that Bilbrough was being too hasty, Bilbrough stated, "I guess I just like breaking the law. Lol." **Exhibit B** (Exhibit 4).

Other evidence submitted at the hearing further demonstrated that the defendant posed a serious risk of danger to the community and flight, including: (1) a photograph of the shooter at the Pittsburgh synagogue with the caption "HERO," which was taken from the defendant's phone, *see* **Exhibit B** (Exhibit 5); (2) a disturbing text message regarding rape, also taken from the defendant's phone, *see* **Exhibit B** (Exhibit 6); and (3) a passport application recovered from the defendant's residence in which the defendant writes that he applied for a new passport because "my grandmother threw [his old passport] away because she didn't like my travel plans and didn't tell me," **Exhibit B** (Exhibit 7). The Government also highlighted transcripts of recorded calls between the defendant's father and grandmother, the person he continues to rely on as his proposed third-party custodian. During these calls, the defendant's grandmother confirms that she is aware of the defendant's radical views and shady associates (including describing Lemley as a "neo-Nazi") and nonetheless affirmatively disclaims any ability or willingness to monitor and control the defendant (*e.g,* "the more

you force it, the more he's gonna be determined to do it" and prayer is "the only answer")—a central fact to Magistrate Judge Sullivan's ultimate ruling in favor of detention.

The defendant countered that he should be released into the custody of his grandmother. At the conclusion of the detention hearing, Magistrate Judge Sullivan detained the defendant, finding that no release condition would reasonably assure either the safety of any other person and the community or the defendant's appearance as required. The Court left open the door, as does the Bail Reform Act, to reconsideration if material facts change. The Court did note, however, that any reconsideration would have to result in a release package that did not involve the defendant going back to the grandmother's house, because the evidence overwhelmingly demonstrated that she simply cannot control the defendant. Specifically, the Court stated:

- "I don't think . . . that going back to the residence is an appropriate house for him."
- "[P]utting him back in the same house where he has fostered these misguided ideas and ideology, I don't think it's going to work."
- "He's not going back to grandma's house. Period. End of discussion."

On January 27, 2020, a federal grand jury for the District of Maryland returned an indictment charging the defendant with two counts of conspiracy regarding the transportation and harboring of co-defendant Patrik Jordan Mathews, and three substantive counts of transporting and harboring Mathews. The same indictment charged Mathews with four felony counts, including being an alien in possession of a firearm and ammunition and transporting a firearm and ammunition in interstate commerce with the intent to commit a felony. Lemley was charged in the same indictment with twelve felony counts, including transporting certain aliens, harboring certain aliens, conspiracy to transport and harbor certain aliens, transporting a machine gun in interstate commerce, disposing of a firearm and ammunition to an illegal alien, aiding-and-abetting

an alien in possession of a firearm, and transporting a firearm and ammunition in interstate commerce with the intent to commit a felony. ECF No. 40.

On January 28, 2020, a federal grand jury for the District of Delaware returned an indictment charging Mathews with four felony counts, including being an alien in possession of a firearm and ammunition, possession of a machine gun, failing to register a machine gun, and obstruction of justice. The same Delaware indictment charged Lemley with six felony counts, including transporting certain aliens, harboring certain aliens, aiding-and-abetting an alien in possession of a firearm, possession of a machine gun, failing to register a machine gun, and obstruction of justice. *See* Case No. 20-00009-cr-LPS (D. Del.).

On February 12, 2020, the defendant filed a motion to reopen the detention hearing. The defendant again offered his grandmother as a third-party custodian. The Government filed a written opposition to release. ECF No. 60. After a lengthy hearing on March 4, 2020, the Court again detained the defendant.

On March 17, 2020, the defendant filed his second motion to reopen the detention hearing, citing concern over COVID-19. ECF No. 69. He again offered his grandmother as a third-party custodian, at the very location Magistrate Judge Sullivan previously rejected. *Id.* The Government filed an opposition and sur-reply. ECF Nos. 70, 73. Magistrate Judge Sullivan denied the motion in a written opinion, without a hearing. ECF No. 76. Magistrate Judge Sullivan summarized the § 3142 analysis as follows:

> At first blush, Mr. Bilbrough's charges may appear non-violent in nature, but the nature and circumstances of the offenses are serious. The relevant conduct underlying these charges involves efforts to form a white ethno-state, commit acts of mass violence, and overthrow the United States government. In addition, the strength of the evidence against Mr. Bilbrough appears to be strong. The government's proffers at both detention hearings reveal an extensive investigation undertaken into the criminal activities of Mr.

> Bilbrough and his co-defendants. As the Court previously explained, these factors weigh heavily in favor of detention. Mr. Bilbrough is a danger to the community. And his prior fixation on traveling to Ukraine to fight with nationalists, along with the maximum penalties he faces if convicted, make him a risk of flight. [ECF No. 76 at 5]

Regarding the defendant's proposed third-party custodian, Magistrate Judge Sullivan wrote:

> At both detention hearings, however, the Court has made clear that Mr. Bilbrough's grandmother is not a suitable third-party custodian and that he may not reside at her home. The reason for this is simple. Before Mr. Bilbrough was arrested, he lived with his grandmother. His grandmother was aware of Mr. Bilbrough's white nationalist activities and was troubled by them. But she did not report Mr. Bilbrough to law enforcement authorities and she was unable to exercise the degree of control over Mr. Bilbrough that would be required of a third-party custodian. This does not make Ms. Bilbrough's grandmother a bad person, but it does disqualify her from serving as a third-party custodian. If Mr. Bilbrough's grandmother was appointed as a third-party custodian, Mr. Bilbrough would remain a danger to the community and a risk of flight. Given the serious nature of the charges in this case, releasing Mr. Bilbrough to live with his grandmother would be an unacceptable risk to the safety of the community. [ECF No. 76 at 5-6]

On March 25, 2020, the defendant moved for review of the detention order. ECF No. 77. His review motion adds no new grounds; the only arguments the defendant makes before this Court are the same ones thrice rejected by Magistrate Judge Sullivan.

## **Argument**

In four separate filings and two extensive hearings, the Government extensively discussed the reasons the defendant should be detained. *See* Case No. 20-mj-192-CBD, ECF No. 13; ECF Nos. 60, 70, 73. The Government will not repeat those reasons here. Rather, the Government writes to summarize some of that information in light of the § 3142 factors. An examination of those factors demonstrates that the detention order should remain in place.

### A.     The Nature and Circumstances of the Offense

The defendant is charged with substantive counts, and with conspiring with co-defendant Lemley, to harbor and transport co-defendant Mathews.  The titles of the charged statutes shield the true nature and circumstances of the defendant's conduct.  Magistrate Judge Sullivan recognized as much: "At first blush, Mr. Bilbrough's charges may appear non-violent in nature, but the nature and circumstances of the offenses are serious.  The relevant conduct underlying these charges involves efforts to form a white ethno-state, commit acts of mass violence, and overthrow the United States government." ECF No. 76 at 5.  The defendant and his co-defendants are dangerous; they hoped and planned for mass violence.  The defendant was a thought-leader within The Base, and his co-defendants looked to the defendant to assist in forming and implementing the ideology of the white ethno-state they sought to create.  And while the defendant is not charged with any firearm counts, his co-defendants are, and the defendant knew of the violent plans his co-defendants intended to implement with the firearms; indeed, in the co-defendants' Delaware residence, the defendant held the firearm that his co-defendants are charged with illegally possessing.

### B.     Weight of the Evidence

As Magistrate Judge Sullivan previously observed, the weight of the evidence against the defendant is strong.  The evidence includes closed-circuit television recordings, Title III oral bug interceptions, FBI Undercover Employee recordings, the results of search warrants of four physical locations in Maryland and Delaware, recordings of jail calls, search warrants related to at least fifteen email accounts and online messaging platforms, financial records, telephone records—and the defendant's own words, in a post-*Miranda*, video-taped statement after he was arrested on January 16, 2020.

### C.  History and Characteristics of the Person

The defendant touts his youth, lack of criminal history, and diabetes as reasons to be released. And while these factors certainly are relevant to the Court's consideration, they are not as strong as the defendant claims and they are outweighed by the factors favoring detention. With regard to the defendant's youth, his age did not prevent him from committing the charged crimes, or from traveling to Georgia, Pennsylvania, Michigan, Georgia again, Delaware, and Alabama to affiliate with fellow white supremacists in furtherance of criminal conduct. Nor was age a limiting factor for so many criminals in whose footsteps the defendant at times sought to follow, including the Charleston church shooter (age 21). The defendant's lack of criminal history also is no reason to release him, given the nature of his conduct; indeed, neither of the defendant's (older) co-defendants had any criminal history, and they remain detained. And, as discussed further below, the defendant's diabetic condition also does not mandate release.

### D.  The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

The defendant's release would seriously threaten the life and liberty of community members, especially minorities. His continued detention is the only guarantee against this threat. Notwithstanding this simple fact, the defendant continues to falsely claim, as he has at prior hearings, that he is not a serious threat because he "voluntarily dissociated himself with his co-defendants and 'The Base' at a time even before he was arrested and at a time when [he] did [not] know he was under investigation." ECF No. 77 at 5. The evidence is to the contrary. The defendant continued to associate with members of The Base through the time of his arrest. For example, he visited his co-defendants in Delaware in late December 2019, as captured on video and audio recordings. And the weekend prior to his arrest, the defendant drove from Maryland to Alabama to associate with an individual he knew from The Base. The defendant had no problem with

7

The Base's ideology or conduct. Rather, instead of concluding that he was "in over his head," ECF No. 77 at 5, the defendant sought to distance himself from The Base as an organization (as opposed to its members) for two reasons: first, because he learned certain information about The Base's founder that made him not want to associate with the founder; and second, because he sought to travel abroad to fight in Ukraine, and to recruit other Base members to join him there. In short, the defendant wanted to be more operational than The Base as an organization.

## II.     D.C. Department of Corrections Has Established Comprehensive Procedures to Avoid a COVID-19 Outbreak.

The defendant's motion does not seriously contest the Government's analysis, focusing instead on the potential health risks posed by COVID-19 and ignoring the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release. The defendant does not allege that he has COVID-19 or even that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental condition." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented substantial precautionary measures to mitigate this risk.

### A.     Comprehensive Precautionary Measures Have Been Instituted to Avoid Transmission of COVID-19.

DOC has undertaken comprehensive precautionary measures to protect detainees from exposure to COVID-19. As additional measures are implemented, DOC is alerting the public to the precautions. *See* https://doc.dc.gov/page/coronavirus-prevention. In addition to the

information on the public webpage, the Government has learned certain of the following by communicating with the United States Marshals Service ("USMS") and DOC's General Counsel.[1]

DOC has installed an "Incident Command System." Each day, the heads of DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the D.C. jails, to discuss strategies to combat any possible spread of COVID through the D.C. jails, to track national trends, and to make sure DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the D.C. Department of Health.

DOC also has taken various steps to protect its facilities, to screen visitors and incoming detainees at intake, to maintain cleanliness within the facilities, and to increase its medical coverage within facilities, including:

- **No Non-Legal Visitation:** As of Saturday, March 14, 2020, DOC suspended all non-attorney in-person visits, programming, and volunteer activities, and has enhanced cleaning efforts, especially within common areas. For staff and legal visitors, DOC performs a COVID-19 screening for these limited visitors. The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature. Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility.

- **Inmate Screening and Awareness:** All new detainees and inmates are subject to similar COVID-19 screening. If an inmate presents with symptoms or provides affirmative answers during screening, they are provided a face mask and taken to medical. Medical does an assessment and makes determination about whether transport to the hospital is appropriate. Furthermore, facility staff are going through the jail units and reminding detainees to put in requests for sick call to see medical if they are feeling poorly. Staff are reminded at roll calls about the need for various preventative measures.

- **Quarantine:** Particular units have been set up to operate as quarantine locations. Detainees are placed in quarantine locations if they show flu-like or COVID-like symptoms.

---

[1] The Government is getting continual updates on the situation at D.C Jail and CTF. Any discrepancies between this filing and prior filings, whether in this or other cases in this District, reflect additional or revised information obtained in the interim. The Government recognizes that the situation is fluid and is trying to deliver the best information to the Court as we understand it at the time.

- **Extra Cleaning:** Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment. DOC has increased its supply of cleaning and sanitation materials. They currently have 55,000 bars of soap and are issuing inmates one bar of soap each week, in addition to allowing additional purchases of soap through commissary. Posters are placed throughout the facilities to remind detainees about preventative measures they can take. DOC staff puts emphasis on maintaining clean surfaces, avoiding touching, and other similar precautions. In addition to standard cleaning, staff perform cleaning spot checks every two hours. A cleaning unit goes through areas common areas to clean frequently touched areas like elevator buttons, escalators, and railings.

As of March 27, 2020, at 4:30 p.m., DOC has implemented additional measures to mitigate the possible spread of COVID-19 by modifying the movement of detainees and inmates as follows:

**Cancellation of Certain Activities:** Off-unit religious services have been cancelled, off-unit activities have been halted, and barbering/cosmetology services have been suspended at this time.

**Reduction of Out-of-Cell Time**: Modified recreation will include a reduction in out-of-cell time (minimum of 2.5 hours daily) to reduce the number of social contacts.

The defendant's motion does not discuss these DOC precautionary measures or allege that these measures are insufficient to address the needs of detainees. Rather, the defendant's motion briefly mentions the circumstances in other states, like Texas and New Jersey. ECF No. 77 at 2. This information does not merit the defendant's release.

As well, while DOC reports five detainees have tested positive for COVID-19, those detainees have been isolated or placed in a quarantine unit. For each of these detainees, DOC's medical team and Unity Health Care are working with the D.C. Department of Health on contact tracing and to protect the health and well-being of other DOC detainees. As part of these measures, as of March 28, 2020, approximately 29 total DOC detainees were in various forms of quarantine.

Each of these reasonable steps is intended to address the actual threat posed by COVID-19 in DOC facilities, and is far more relevant to the Court's determination than the hypothetical speculation that is the focus of the defendant's motion.

### B.     The Defendant's Individual Circumstances Do Not Merit Release.

The defendant's diabetic condition does not change the analysis. In the last two weeks, courts in this District faced with similar contested release motions based on COVID-19 have uniformly rejected release. For example, Judge Grimm denied release for a defendant suffering from "diabetes, high blood pressure, asthma, and pain." *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209. Magistrate Judge Simms denied relief for a defendant who "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection . . . ." *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms). Judge Blake denied relief for an asthmatic defendant. *See United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake). And Magistrate Judge Day denied relief for a 67-year-old defendant. *See United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day).

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

### III.    Releasing the Defendant And Others Similarly Situated Would Place an Undue Burden on Pretrial Services and the Court, Thereby Increasing Community Danger.

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release.  To be sure, one case, by itself, would not strain the system.  But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release.  Each defendant would make the generic argument, now being made by the defendant, that he should be released to reduce contact with other persons and have greater access to healthcare in the community—notwithstanding the fact that the Court has detained the defendant to protect the community *from* him.  The speculative prospect of a mass COVID-19 outbreak at CTF does not diminish the public interest in keeping the defendant off the streets based on a judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions.  And if the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.

## **Conclusion**

For the foregoing reasons, the Court should order the defendant to be detained pending trial.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Thomas P. Windom
Thomas M. Sullivan
Assistant United States Attorneys

Jamie M. McCall
Special Assistant United States Attorney