UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| VS. | * | CASE NO. TDC 20-00033 |
| WILLIAM GARFIELD BILBROUGH, IV | * | |

**REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S APPEAL FROM THE DENIAL OF THE DEFENDANT'S MOTION TO VACATE DETENTION ORDER AND SET CONDITIONS OF RELEASE AND REQUEST FOR AN IMMEDIATE HEARING**

The Defendant, by and through his attorneys, Robert C. Bonsib, Esq. and Megan E. Coleman, Esq., respectfully files this Reply to the Government's Response to the Defendant's Appeal from the Denial of the Defendant's Motion to Vacate Detention Order And Set Conditions of Release and Request for an Immediate Hearing and, in furtherance thereof, states as follows:

**EXHIBITS IN SUPPORT OF BILBROUGH'S REPLY**

In support of the Defendant's Reply to the government's Response to the Defendant's Appeal from the Denial of the Defendant's Motion to Vacate Detention Order and Set Conditions of Release and Request for An Immediate Hearing, Bilbrough submits the following Exhibits in support of his Reply:

1. April 1, 2020 Washington Post Article – CDC and risk to diabetes from Covid-19
2. Judge Boardman's Memorandum Opinion in *United States v. Davis*
3. Judge Moss' Order and Memorandum Opinion in *United States v. Harris*
4. PTSO Options Re: Location Monitoring
5. March 26, 2020 BOP Memorandum Re Transferring Inmates To Home Confinement
6. District of Columbia DOC Notices Re Inmates Testing Positive For Covid-19

7. FOP Memorandum Re: DOC and Covid-19

8. Selected Notices/Orders From USDC Re: Covid-19 Safety Precautions

9. Photographs from NRA Website

10. Photographs Re: slaughtering of animals

11. Supplemental Memorandum – *United States v. West*

**COVID-19**

Even before COVID-19 paralyzed the Washington Metropolitan area, Bilbrough had made legitimate and persuasive arguments as to why detention was not necessary in this case. Despite ultimately deciding to detain Bilbrough, United States Magistrate Judge Timothy Sullivan indicated that his decision was a "close call." While the call should have been made in favor of setting conditions of release, that "close call" now tips the scales in favor of setting conditions of release based on the unexpected arrival of COVID-19 on the scene.

The government has discounted from the beginning the threat of COVID-19 and continues to minimize its risks to Bilbrough and others similarly situated.

The CDC, as reported on April 1, 2020 in the *Washington Post*, has noted the particular risk to those suffering from certain medical conditions, including diabetes, which has been and continues to be a life-long condition with respect to which Bilbrough must deal. (See Exhibit No.1)

The United States District Court for the District of Maryland has issued successive Standing Orders and procedural guidelines, each more restrictive and each evidencing an increasing level of concern about conducting court business that risks person-to-person contact and exposure. (See Exhibit No. 8). Those representing the government who suggest that people who are confined in close quarters in detention facilities are being appropriately protected, present their arguments to the Court by teleconference or other electronic means that protect themselves from being present in

close quarters with others.

In its Response, the government, if nothing else, has been rigidly consistent in its position regarding the lack of risk to Bilbrough of his exposure to COVID-19 – and continues to fail to recognize what is going on in the real world even as judges in Maryland and around the country are adjusting to this new factor that must be evaluated in making release decisions. Prosecutors are working from home. Courts are cancelling court for the foreseeable future except for emergency hearings – and when those hearing are to occur – extreme precautions are being taken. The entire federal courthouse in Greenbelt has been closed. Correctional officers and inmates in the District of Columbia detention facilities are increasing in the numbers who are testing positive.

Judges are issuing opinions on a daily basis that recognize the need to review release factors.

Judge Boardman, in *United States v. Michael Davis, Jr.,* No. ELH-20-09, 2020 WL 1529158 (D. Md. Mar. 30, 2020), recently rejected the government's motion to detain Davis, finding "that the COVID-19 public health emergency must be considered when weighing 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release' and the defendant's 'physical and mental health.'" *Id*. at \*3 (citing 18 U.S.C. § 3142(g)(3)(A) & (4)). Judge Boardman's analysis of the current COVID-19 crisis as it affects the criminal justice system is compelling and does not need to be repeated herein but is adopted and incorporated into this Reply and is found in Exhibit No. 2.

In that case, Davis had been indicted by the grand jury for distribution of fentanyl and cocaine base, offenses that carry a potential sentence of twenty years imprisonment. Unlike the instant matter, in the *Davis* case there was a statutory presumption in favor of detention. Judge Boardman noted that the charges are serious, occurred on multiple occasions, and in addition to distributing narcotics, Davis also sold five firearms to an informant. Judge Boardman further noted

that the evidence against Davis was strong. (See Exhibit No. 2)

With respect to dangerousness to the community, Judge Boardman found that "the presumption of detention as to dangerousness has been rebutted due to the COVID-19 health crisis," however, the "danger to the community" analysis, did not stop there, rather the court also took into consideration whether Davis himself posed a danger to the community such that releasing him would be more dangerous than keeping him detained. *Id*. at *5 (citing *United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement..."); *United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop...A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis.")).

Although Davis was a danger to the community based upon his alleged drug dealing and his unlawful sale of firearms to a confidential informant over a six-month period last year, the Court recognized that almost every case will present with evidence of danger to the community based on alleged criminal conduct.  However, the plain language of the statute requires the Court to evaluate the "nature and seriousness of the danger, " language that makes clear that there are different types of dangers and varying levels of seriousness. *Id*. at *5.

After identifying the specific nature of the danger and how serious it is, the Court then must consider available release conditions that will address those concerns and "reasonably assure" the safety of the community. *Id*. "The statute requires 'reasonable assurance,' not a 'guarantee.'" *Id*. (citing *United States v. Orta*, 760 F.2d 887, 891–92 (8th Cir. 1985)).

Judge Boardman weighed the following:

Davis has no prior criminal convictions and no history of violence. The government agrees that he did not engage in violent acts during the period of alleged criminal conduct. The government's concerns about danger to the community if he were released – that he would return to dealing drugs and selling firearms unlawfully – can be addressed with release conditions. With these conditions in mind, the Court finds that Davis's continued incarceration poses a greater risk to community safety than his release. *See Harris*, 2020 WL 1482342, at *1 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions."); *United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community" because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (finding that Ramos's "continued detention poses a risk of danger to himself and others").

With respect to flight, the Court finds that the government has not shown by a preponderance that Davis poses a risk of non-appearance. He has strong ties to Baltimore. His entire family lives here. He has lived here his entire life. He does not have a passport and has never traveled out of the country. When he has been ordered to appear in court on charges in the past, he has complied with the court's orders. Additionally, the pandemic has significantly curtailed travel throughout the region, including through Governor Hogan's order today that all Marylanders stay at home, providing additional assurance that Davis would not leave the area even if he had the financial resources to do so. *See Ramos*, 2020 WL 1478307, at *1 ("[T]he court finds that the circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial...").

The Court has considered the arguments and proffers of counsel, the Pretrial Services Report, and the publicly available information about COVID-19. Having applied them to the factors in the Bail Reform Act, the Court finds that there are conditions that will reasonably assure Davis's appearance in court and the safety of the community. Davis must reside at his girlfriend's home in Baltimore. She will serve as his third-party custodian. He is confined to the residence except for medical appointments, meetings with counsel, court appearances, and other activities specifically approved by the Court and

>as pre-approved by Pretrial Services. Davis also must comply with all directives from federal, state, or local government pertaining to public health, including COVID-19. Pretrial Services should monitor his compliance with home confinement through location monitoring technology it deems appropriate. Davis may not use any controlled dangerous substances or illegal narcotics; he must attend substance abuse and mental health evaluation and counseling, if deemed appropriate by Pretrial Services; and he must submit to drug testing. Every condition of release is identified in the Order Setting Conditions of Release, ECF No. 20. Defense counsel should review the release order with his client, have Davis and his third-party custodian sign it acknowledging the conditions and consequences of a failure to abide by them, and submit a signed copy to the Court as soon as practicable.

(See Exhibit No. 2)

With respect to Bilbrough, Judge Boardman's analysis is instructive and more fully supports the fact that releasing Bilbrough would not present a danger to the community.  As Judge Boardman noted, the Bail Reform Act requires conditions that "reasonably assure" the safety of the community, not a "guarantee."

Like Davis, Bilbrough did not engage in violent unlawful conduct during the period within which he was otherwise charged with criminal conduct, he has no prior record (nor even arrests as did Davis), has been a resident of Denton, Maryland his entire life.

Judge Moss' Order for release in *United States v. David Harris*, No. 19-356 (D.D.C. March 26, 2020) similarly concluded in a child pornography case, that

>The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to the community than the risk posed by the Defendant's release to home confinement on these strict conditions.  All responsible government agencies have advised of the risk of transmission posed by large gatherings, and the Court understands Defendant is housed in a unit with dozens of other detainees and inmates.  The risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real.

(See Exhibit No. 3).

**DENIAL OF ACCESS TO COUNSEL**

In *Davis,* Judge Boardman also recognize the importance of access to counsel. Restriction of access to counsel continues to become more restrictive at detention and correctional facilities. *See* Exhibit Nos. 5. 6, 7, 8 (discussion in memorandum of current status in detention facilities).

Frankly, undersigned counsel is also concerned about his personal safety in being physically present at CTF where the number of inmates and correctional officers being tested positive continues to increase, but also is concerned about becoming an unwitting carrier of COVID-19 into the facility and being the one to expose Bilbrough. Even if released, undersigned counsel would not choose to be in the physical presence of Bilbrough for at least for the next few weeks, both to protect undersigned counsel and as well as to protect Bilbrough. If, however, Bilbrough is released, there are alternative means for counsel to consult with Bilbrough through telephonic and video conferencing.

The amount of discovery materials provided by the government to defense counsel is extensive. Many gigabytes of electronic discovery including video surveillance recordings and forensic phone downloads need to be reviewed. Such a review of materials with Bilbrough will be at a standstill until this crisis passes or unless Bilbrough is released.

If Judge Boardman is correct in her analysis that an individual such a Davis who has been indicted for much more serious charges than Bilbrough, who is older, has no physical conditions that puts him at extra risk because of COVID-19, has no prior record of convictions (although unlike Bilbrough has multiple prior arrests), can be released under reasonable conditions, then Bilbrough is even a more appropriate candidate for release.

**18 U.S.C. § 3142(e) DOES NOT AUTHORIZE PRETRIAL DETENTION UPON PROOF OF DANGER TO THE COMMUNITY OTHER THAN FROM THOSE OFFENSES WHICH WILL SUPPORT A MOTION FOR DETENTION**

In *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986), the Third Circuit held that 18 U.S.C. § 3142(e) does not authorize pretrial detention upon proof of danger to the community other than from those offenses which will support a motion for detention. *See also United States v. Ploof*, 851 F.2d 7 (1988) (same). The Court found that detention hearings are limited to the cases specified in subsection (f). *Id*.

18 U.S.C. § 3142(f) requires a detention hearing, (1) upon motion for the Government in a case that involves --

> (A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;
>
> (B) an offense for which the maximum sentence is life imprisonment or death;
>
> (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;
>
> (D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or
>
> (E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code.

Bilbrough's case does not involve any of the above. While the same may not be true of his co-defendants who were charged with firearm offenses, Bilbrough has not been indicted on any firearm offense.

18 U.S.C. § 3142(f) also requires a detention hearing, (2) upon motion by the government or upon the judicial officer's own motion, in a case that involves --

(A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

It was never contended that Bilbrough would obstruct or attempt to obstruct justice or threaten a witness or juror if released.

While Judge Sullivan found that Bilbrough's "prior fixation on traveling to Ukraine to fight with nationalists, along with the maximum penalties he faces if convicted, make him a risk of flight," [ECF NO. 76 at 5], Judge Sullivan did not find that Bilbrough was a "serious risk" of flight. Bilbrough did not possess a valid passport, Bilbrough's grandmother maintained possession of the passport and turned it over to undersigned counsel who has been maintaining it during the pendency of these proceedings and will surrender it to the Clerk as a condition of Bilbrough's release. The Bail Reform Act does not authorize pretrial detention without bail based solely on a finding of dangerousness. *U.S v. Twine*, 344 F.3d 987 (9th Cir. 2003); *U.S. v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *Ploof*, 851 F.2d at 7; *Himler*, 797 F.2d at 156.

The Bail Reform Act does not authorize detention based upon dangerousness unless it meets the criteria narrowly circumscribed in the statute, and is proven by clear and convincing evidence. There is no presumption of dangerousness here. The Bail Reform Act is to consider **present and future dangerousness**. *United States v. Salerno*, 481 U.S. 739 (1987). (emphasis added).   For reason set forth throughout the filings in this matter, it is clear that at this time Bilbrough represents no danger to the community.

The Government cannot meet its burden as discussed next.

**The government did not "put up" and, therefore, should not be heard as to what it contends that Bilbrough did – but for which he has not been indicted.**

A fact well recognized within the criminal justice bar is the fact that the grand jury is essentially the "rubber stamp" of the government. With very rare exception – the government gets what it wants from the grand jury. If the government seeks to now assert that despite its decision to only ask the grand jury to "rubber stamp" its request for charges of conspiracy to harbor an alien, and related offenses against Bilbrough, it's position that Bilbrough was really involved in other criminal conduct should be accorded no weight nor consideration in this appeal.

The government has previously acknowledged and conceded that Bilbrough's conduct occurred on a few day, on a couple of occasions, and consisted of conduct where Bilbrough was a passenger in a vehicle – or occasionally drove a co-defendant's vehicle – for a limited period of time – when co-defendant Patrick Matthews was a passenger.

The government unfairly and inaccurately attributes to Bilbrough conduct as to which he has not been charged – and when the government had the chance (had it had the necessary evidence – which it did not) – did not ask the grand jury to indict him on anything other than the charge of harboring and conspiracy to harbor Patrick Matthews.

Not only has the government conceded in hearings before Judge Sullivan that Bilbrough, on his own initiative, moved away from association with The Base members and his co-defendants, but in open court proceedings that fact has been placed on the public record – a fact that would also make it unlikely that Bilbrough would return to associating with Base members and activities – and he clearly would not be welcome.

### This Honorable Court should reject the government's attempt to inject into its Response arguments that are strictly inflammatory but not even marginally probative on the issues pertinent to setting conditions of release

The government attaches as Exhibits A and B pictures of the beheading of a goat and the fact that Bilbrough participated in a shooting – an event that the government does not even suggest was an unlawful act.

So, let's put these photographs in perspective.

With respect to the photographs of Bilbrough shooting a firearm, it was on private property in Georgia where the possession and shooting of the firearm was lawful and not the subject of any criminal charge. A quick search on the NRA website will reveal photographs that are a least, and it is respectfully submitted, more inflammatory than the photographs that the government submitted in its Exhibit A. (See Exhibit No. 9)

With respect to government's Exhibit B – which shows the severed head of a goat – while it is a disturbing photograph – it has nothing to do with whether or not there are appropriate conditions of release that can be set in this matter. Participation in rituals that sacrifice animals, which this was, or even in the animal slaughter as part of this nation's food chain – provides no basis for suggesting that those involved in such activities represent a danger to the community. (See Exhibit No. 10)

### Bilbrough's statements are protected by the free speech provisions of the First Amendment of the United States Constitution

It is clear that Bilbrough was engaged in conversations that were both disturbing and radically offensive. Our Constitution protects our citizens' rights to be disgusting and racially insensitive. One need only consider the comments spoken by our national leaders – at all levels – from the top to the bottom – to experience the toxic nature of much of that commentary.

### "Radical Views" – "Misguided Ideas and Ideology"

Bilbrough cannot be detained for his "radical views" and "misguided ideas and ideology," which are protected pursuant to the First Amendment of the United States Constitution.

There is nothing unlawful about the "two photographs of the defendant firing weapons in a propaganda video for The Base." Gov't Response at 1. The Government has not offered any evidence that shooting these firearms in the South, where this occurred, was against the law of the State. This "propaganda video" is no different than the "propaganda video" that the NRA posts on its website. Furthermore, the date of the firing of the weapons was August 18, 2019, a date not contained within the Indictment, and not in any way related to the conduct of conspiring to transport and harbor an alien.

There is nothing unlawful about performing a Nazi salute while preparing to sacrifice a goat. Gov't Response at 1. A Nazi salute is protected speech, no matter how abhorrent it may be viewed, and cannot be used as a factor to detain Bilbrough. Likewise, there is no evidence that sacrificing a goat is illegal in the State where it occurred. If the slaughtering of the animal were to be deemed criminal, it still is not a crime committed against a person.

Idolizing a criminal is not a crime, it is protected under the First Amendment, and Bilbrough cannot be detained for his likes or dislikes of others. See Gov't Response at 2 (referring to photo of shooter at Pittsburgh Synagogue).

That "[t]he defendant was a **thought-leader** within the Base and his co-defendants looked to the defendant to assist in **forming and implementing the ideology** of the white ethno-state they sought to create," Gov't Response at 6, again punishes Bilbrough's thoughts and beliefs, not his conduct.

That "the defendant **knew** of the violent plans **his co-defendants intended** to implement

with the firearms," Gov't Response at 6, does not make Bilbrough guilty of a separate conspiracy between his co-defendants that may have involved violence.

That "[t]he defendant and his co-defendants…**hoped** and **planned** for mass violence," Gov't Response at 6, is not grounds to hold Bilbrough for two reasons. First, Bilbrough's *hopes* for mass violence, if proven by the Government, still cannot be punished based on the First Amendment. Second, there is no evidence that Bilbrough "planned" for mass violence, even if it can be established that his co-defendants, in a separate conspiracy did. The conspiracy that Bilbrough is charged with is not for the planning of mass violence and no evidence supports Bilbrough's plan for mass violence.

Judge Sullivan erred as a matter of law by denying bail based on the rationale that he would be "putting him back in the same house where **he has fostered these misguided ideas and ideology**, I don't' think it's going to work." Gov't Response at 3. The Court and the Constitution cannot inhibit a person's ideas and ideology, no matter how "misguided."

Judge Sullivan erred as a matter of law by denying bail based on the unproven accusation that Bilbrough was connected to an "effort[] to form a white ethno-state, commit acts of mass violence, and overthrow the United States government." Gov't Response at 4.

To repeat, Bilbrough has not been charged with any crimes of violence. When his residence was searched, no firearms or contraband was found. He has not been present at any public events and engaged in any violent actions.

The only evidence that the government has presented is that he drove a car and was a passenger in a car with a person who crossed into the United States without authorization, that he "talked" about things – that he never did, nor did he take any affirmative action to do and that he participated in shooting firearms in a lawful manner at a lawful location.

13

### Whether or not PTSO has the equipment or the personnel to physically install location monitoring equipment on Bilbrough or at his residence is not a factor upon which to base continuing to detain Bilbrough

As it's final volley to support its position that this young, 19 year old kid, charged with a non-violent offense, with no prior record, should be detained despite his risk position in CTF – the government now suggests that the inability of the PTSO to install and supervise him on EM should be a reason for his continued detention. So let's look at this – it is too dangerous for healthy, armed pretrial officers to go to the Bilbrough's residence to put a bracelet on his ankle – but there is no recognizable risk to Bilbrough in being confined in a facility with hundreds of individuals, in close quarters, some of whom have already been confirmed Covit-19 carriers?

Let's look at the government's position. Presently the Defendant has a residence, a safe place – where he can live – under restricted conditions – pending the resolution of his case. Tomorrow, the next day – or in the near future - if Bilbrough gets Covid-19 – then what – then he can't live at his home with his grandmother – will the government provide an appropriate place for him to live, assuming he does not have to be hospitalized?

### Judge Grimm's opinion is not relevant authority to support the government's position

Bilbrough has previously analyzed why Judge Grimm's memorandum opinion is inapposite to this case. Judge Boardman has subsequently issued an opinion that is more relevant to the issues present today with respect to whether Bilbrough should be released. Bilbrough recognizes that the landscape with respect to these issues changes day-by-day – but to the extent that the landscape changes – that change moves in the direction to support Bilbrough's position that he be released.

Judge Blake, in *United States v. Collins,* (March 30, 2020; 2020 WL 1506176) has

recognized that even though traditional location monitoring is not currently available, other methods of monitoring may be implemented in the discretion of the probation office. This is confirmed by the email distributed by the Pretrial Services Office. (See Exhibit No. 4)

### Gail Bilbrough is not only an appropriate third-party custodian – but she is the best person to be a third-party custodian for the Defendant

The government incredibly continues to assert that Gail Bilbrough is not an appropriate person to serve as a third-party custodian. Judge Sullivan's conclusion that she is not an appropriate third-party custodian is, frankly, wrong. As Bilbrough has previously noted – she should not be disqualified simply because she is his *de facto* mother. One who has distant in a relationship with Bilbrough would have even less a reason to be conscious and diligent in ensuring that Bilbrough is complying with conditions of release set by the Court. Not only would Gail Bilbrough be a reliable third-party custodian – but she would "walk the walk" and not just "talk to the talk." She hid Bilbrough's passport when she heard him talking about joining the Ukrane military and lead him to believe it had been lost. She destroyed much of his Nazi propaganda well before he was arrested. She is prepared to put up her paid-off residence and risk essentially her entire financial position by posting her house and depositing the bulk of her liquid assets with the Court as confirmation that not only would she be an appropriate third-party custodian – but that she is confident that Bilbrough would strictly comply with any conditions of release set by the Court.

### You Can't Report What's Not a Crime

The Government contended that Gail Bilbrough is not a suitable third party custodian because she "confirms that she is aware of the defendant's **radical views** and **shady associates** (including describing Lemley as a "**neo-Nazi**") and nonetheless affirmatively disclaims any ability or willingness to monitor and control the defendant." Gov't Response at 2.

15

Judge Sullivan erroneously took the government's bait in finding that Gail Bilbrough was not a suitable third-party custodian because "she was aware of Mr. Bilbrough's white nationalist activities and was troubled by them. But she did not report Mr. Bilbrough to law enforcement authorities and she was unable to exercise the degree of control over Mr. Bilbrough that would be required of a third-party custodian." Gov't Response at 5.

What would Ms. Bilbrough report to law enforcement? That her grandson is a white nationalist. That he hates Blacks and the Jews. That he hails Hitler. Are any of those reportable crimes? NO. All of those beliefs are lawful and protected. Ms. Bilbrough could not have been controlling Mr. Bilbrough's thoughts and beliefs any more than the rest of us because the founders of our Constitution give every American citizen the right to believe in whatever they want, no matter how despicable.

Judge Boardman in her opinion in *Davis* recognized that at the hearing that the government raised concerns about Davis' third-party custodian. While Judge Boardman agreed that Davis's girlfriend was not an ideal custodian, Judge Boardman concluded that under the present circumstances of COVID-19, she was an appropriate third-party custodian. Opinion at *6, n. 8. Davis's girlfriend is 33 years old, has two minor children, and lives in Baltimore. She works as a pizza delivery driver five nights a week. She is willing to have Davis live in her home and serve as a third-party custodian. She appeared at the detention hearing by telephone. She has a dated criminal history of drug charges when she was younger, but she completed drug treatment and has no recent charges. Judge Boardman concluded that she was suitable, particularly in light of Davis's compliance with prior court-ordered conditions, lack of criminal history, and the location monitoring release condition.

Gail Bilbrough is a mature woman, with no prior arrests or criminal record of any sort. She

has an appropriate residence where it would just be her and Bilbrough living at that location.  In addition, she is willing to post substantial collateral with the Court – the forfeiture of which would essentially impoverish her.

If a girlfriend with the background set forth in the *Davis* opinion is not disqualified because she is a "girlfriend" surely Bilbrough's grandmother should not be disqualified from being a third-party custodian because of her relationship with Bilbrough.

## **SUMMARY AND CONCLUSION**

Bilbrough understands and fully recognizes that Courts are addressing requests for release in these difficult times sometimes reach different decisions and that it is difficult to compare one court's decision as to whether or not to release an individual without a full understanding of the specifics of an individual case with the decision of another court.

However, decisions in other cases can be helpful in understanding how courts have approached issues relating to requests for release under difficult and evolving critical situations.

For each and all of the foregoing reasons, Bilbrough respectfully requests that this Honorable Court vacate the order of detention in this matter and set appropriate conditions of release.

Respectfully submitted,

MARCUSBONSIB, LLC

*/s/ Robert C. Bonsib*
_____
ROBERT C. BONSIB, ESQ.
64ll Ivy Lane, Suite ll6
Greenbelt, Maryland 20770
robertbonsib@marcusbonsib.com
(30l) 44l-3000
Trial Bar No. 00324

/s/ Megan E. Coleman

---

MEGAN E. COLEMAN, ESQ.
64ll Ivy Lane, Suite ll6
Greenbelt, Maryland 20770
robertbonsib@marcusbonsib.com
(30l) 44l-3000
Trial Bar No. 17552

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing motion was filed, via ECF, this 2nd day of April 2, 2020 to all parties of record.

/s/ Robert C. Bonsib

---

ROBERT C. BONSIB