# EXHIBIT NO. 2

# JUDGE BOARDMAN'S MEMORANDUM OPINION IN *UNITED STATES V. DAVIS*

2020 WL 1529158
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

UNITED STATES OF AMERICA
v.
MICHAEL DAVIS, JR., Defendant.

Case No.: ELH-20-09
|
03/30/2020

Deborah L. Boardman, United States Magistrate Judge

### MEMORANDUM OPINION

*1 Pending before the Court is the government's motion for pretrial detention. For the reasons stated in this Memorandum Opinion and on the record, the motion is denied, and the defendant Michael Davis, Jr. ("Davis") is ordered released from U.S. Marshal's custody subject to the conditions set forth below and in the accompanying Order Setting Conditions of Release, ECF No. 20.

### Procedural History

On January 9, 2020, a grand jury sitting in this Court returned an indictment against Davis charging him with conspiracy to distribute and possess with intent to distribute a controlled dangerous substance, cocaine base, in violation of 21 U.S.C. § 846 (Count I); distribution of a controlled dangerous substance, cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count II); and distribution of a controlled dangerous substance, fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count IV). ECF No. 1. The maximum penalty for each charge is 20 years' imprisonment. On January 14, 2020, Davis appeared in Court for his initial appearance and was appointed counsel. At the hearing, the government moved for his detention. A detention hearing was scheduled for January 16, 2020, and a temporary order of detention was entered. Davis ultimately consented to detention and no hearing was conducted. An Order of Detention by Agreement was entered "without prejudice to either side requesting a prompt hearing to set appropriate conditions of release or otherwise address the detention of the defendant." ECF No. 14.

On March 21, 2020, Davis notified the Court that he now requests a detention hearing. ECF No. 16. He is entitled to a hearing under 18 U.S.C. § 3142(f). The hearing occurred on March 30, 2020.[1] No trial date has been set.

### The Bail Reform Act

Under the Bail Reform Act, the government may move for a defendant's pretrial detention if the case involves, among other offenses, "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)...." 18 U.S.C. § 3142(f)(1)(C). When a defendant is charged with such an offense, as is the case here, and the Court finds probable cause to believe the defendant committed the crime, there is a presumption, subject to rebuttal by the defendant, that "no combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). The presumption of detention "places 'a limited burden of production—not a burden of persuasion' on the defendant to 'com[e] forward with evidence that he does not pose a danger to the community or a risk of flight.' " *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (quoting *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)); see *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Moss*, 887 F.2d 333, 338 (1st Cir. 1989); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). When the defendant meets his burden of production, it "remains a factor to be considered among those weighed by the district court" but "does not eliminate the presumption favoring detention." *Khusanov*, 731 F. App'x at 21 (quoting *English*, 629 F.3d at 319). The government bears the burden of proving by a preponderance that no condition or combination of conditions will reasonably assure the defendant's appearance and by a clear and convincing showing that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f); see *Khusanov*, 731 F. App'x at 21 (noting that the "ultimate burden" of proof remains on the government to "mak[e] a preponderance showing that the defendant poses a risk of flight and a clear and convincing showing that he presents a danger to persons or the community"); *Stone*, 608 F.3d at 945 ("As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the government retains the 'burden of

persuasion.' ") (citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *Moss*, 887 F.2d at 338; *Suppa*, 799 F.2d at 119; *Portes*, 786 F.2d at 764; *Alatishe*, 768 F.2d at 371.

**\*2** The Bail Reform Act requires that the Court consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including
>
> ——
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g).
If after a hearing, and upon consideration of these factors, the Court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," then the Court "shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Alternatively, if the Court finds that there are conditions or a combination of conditions that will reasonably assure the person's appearance and the safety of any other person and the community, the person may be released subject to certain conditions, including, among others, home confinement and third-party custodianship. 18 U.S.C. § 3142(c)(1).

The Supreme Court has held that pretrial detention is disfavored. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). In *Salerno*, the Supreme Court ultimately approved pretrial detention based on dangerousness, but the Court was clear that the Bail Reform Act is preventative, rather than punitive, in nature. *Id.* at 747–48. Consistent with the Supreme Court's holding, the Bail Reform Act states that nothing in it "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

### Analysis of Bail Reform Act Factors

Davis is 34 years old. He was born and raised in Baltimore, Maryland. Before his arrest, he was in regular contact with his mother, brother, two sisters, and four children, all of whom live in Baltimore. He does not possess a passport and has never traveled outside of the United States. At the time of his arrest, Davis was unemployed, but his most recent employment was as a roofing laborer. Before that, Davis was employed, through a temporary staffing agency, with a Baltimore County trash pickup service from approximately 2017 until 2018. Davis has performed various manual labor jobs, such as moving, hauling, and construction, since he was 18.

**\*3** Davis has no prior criminal convictions. He has been arrested and charged with offenses on six prior occasions, but every prior charge has been dismissed. After these prior arrests, he was released by a court on his own recognizance four times and once on bond. There is no release information for the final arrest. Davis has no history of failing to appear for court.

Davis reported two months ago to Pretrial Services that he is in excellent physical health. He now reports that he has bronchitis. He appears to have significant mental health issues. His mother reported to the Pretrial Services Officer that her son exhibits symptoms of bipolar disorder and major depressive disorder. She said that she has been diagnosed with those mental health conditions, and she observes similar behavior in her son, including a short temper, headaches, lack of appetite, alcohol consumption, and marijuana use. Davis's mother also reported that he has a history of suicidal ideation and suicide attempts. As recently as October 2019, he threatened to commit suicide. He attempted suicide in 2017 and August 2019. Davis has a history of substance abuse. He reported that at the time of his arrest, he smoked marijuana three times a day and consumed alcohol weekly. He

previously consumed ecstasy approximately once a month. According to his mother, Davis has never been hospitalized or participated in mental health treatment or substance abuse treatment. At the time of his arrest, Davis had been homeless for two years, staying with friends and family.

Davis has been charged with federal drug offenses. In the indictment, it is alleged that Davis conspired with his co-defendant to distribute cocaine base between August and October 2019. It is further alleged that on two occasions in the fall of 2019, Davis unlawfully distributed cocaine base and fentanyl. These charges are serious.

The government has proffered additional information about Davis's alleged criminal conduct. During the hearing and in its submission in support of continued detention, the government asserts that beginning in the spring of 2019, the ATF placed an undercover agent and a confidential informant (CI) in Baltimore's Pigtown neighborhood who conducted numerous controlled buys of drugs and firearms from Davis and others. ECF No. 17 at 2. From June until October 2019, the government claims that the CI conducted more than 10 controlled buys from Davis, purchasing cocaine base, cocaine, heroin, and fentanyl from him. *Id.* It is further alleged that the CI purchased five firearms from Davis during this period. *Id.* at 2–3.

The weight of the evidence against Davis is strong. According to the government, Davis was repeatedly captured on audio and video conducting the drug and firearm transactions and most of them were also witnessed by an undercover agent. *Id.* at 4.

Davis argues that he should be released because of the COVID-19 public health emergency. The current public health crisis certainly factors into the decision to detain or release someone pending trial. *See United States v. Jefferson*, No. CCB-19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3–4 (D. Md. Mar. 17, 2020). The Court finds that the COVID-19 public health emergency must be considered when weighing "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" and the defendant's "physical and mental health." 18 U.S.C. § 3142(g)(3)(A) & (4).

*4 In the midst of a public health crisis, the Court must rely largely on the expertise of the Centers for Disease Control and Prevention (CDC), public health officials, and medical professionals when it assesses "the danger to any person or the community that would be posed by the person's release." In that regard, the Court has been educated by a March 25, 2020 letter to Governor Hogan signed by over 200 public health experts, doctors, and nurses who teach at Johns Hopkins Bloomberg School of Public Health, School of Nursing, and School of Medicine expressing their "urgent concern about the spread of COVID-19 in Maryland's prisons, jails, and juvenile detention centers." *See* Mar. 25, 2020 Ltr. from Johns Hopkins Faculty to Gov. Hogan ("Hopkins Faculty Ltr."), *available at* https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf, attached to this Memorandum Opinion as Exhibit 1. These Hopkins faculty members believe "an urgent priority in this time of national public health emergency [is] to reduce the number of persons in detention as quickly as possible." *Id.* They advise that reducing the number of detained persons in Maryland will make the community safer. The Court agrees.

In their words:

> This pandemic is shedding a bright light on the extent of the connection between all members of society: jails, prisons and other detention facilities are not separate, but are fully integrated with our community. As public health experts, we believe these steps are essential to support the health of incarcerated individuals, who are some of the most vulnerable people in our society; the vital personnel who work in prisons and jail; and all people in the state of Maryland. Our compassion for and treatment of these populations impact us all.

*Id.*

The CDC, the Hopkins faculty, and other public health officials are instructing us that social distancing is the only way to slow down the spread of COVID-19, to flatten the curve, and to avoid a strain on our scarce healthcare resources. Social distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially

detainees. The inability to practice social distancing in jails makes "transmission of COVID-19 more likely." *Id.*[2]

The risk caused by the inability to social distance is exacerbated by the fact that pretrial detention facilities see a daily flow of people entering and leaving the facility who could be carrying the virus but are asymptomatic.[3] *See id.* (noting that "population mixing of staff and detainees also increases likelihoods of exposure" and "[t]his has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff"); *United States v. Barkman*, No. 19-cr-52-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628, at *3 (D. Nev. Mar. 17, 2020) ("Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.").

As of today, there are five detainees at the Correctional Treatment Facility (CTF), where Davis is detained, who have tested positive for COVID-19. It would be a welcome relief if the number stopped there, but that is unlikely. The first positive was reported last Wednesday, the second a day later, and three more over the weekend.[4] There is no evidence that Davis has been infected. He reported to Pretrial Services two months ago that he was in excellent health. He reports today that he has bronchitis. Other than bronchitis, he does not have any other apparent underlying health conditions that put him at greater risk of harm if he were exposed to the virus. The government argues that because he is in excellent health, this factor does not support release. ECF No. 17 at 5. The Court disagrees. If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary. The Court finds that the "physical and mental health" factor cuts in favor of release for any defendant during this public health crisis. If Davis has bronchitis, this underlying health condition would raise his risk for greater harm if exposed, which in turn would make this factor even more compelling.[5]

*5 Experts agree that pretrial detention facilities are poorly equipped to manage a crisis resulting from this potentially deadly, highly contagious novel coronavirus within their walls. By design, jails are not medical facilities. "[F]or incarcerated individuals who are infected or very sick, the ability properly to treat them and save their lives is very limited. Testing kits are in short supply, and prisons and jails have limited options for proper respiratory isolation." *See* Hopkins Faculty Ltr.[6] The spillover effect that an outbreak in a pretrial facility would have on the greater community is undeniable and concerning. *See id.* ("Prison, jail, and detention center staff may bring the virus into the facility and are also at risk of acquisition from infected incarcerated individuals. Once infected, staff may also transmit the virus back into the communities and to their families. As jail, prison, and detention center health care staff themselves get sick with COVID-19, workforce shortages will make it even more difficult to adequately address all the health care needs in facilities."). "The risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real." *United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020).[7]

The Court finds that the presumption of detention as to dangerousness has been rebutted due to the COVID-19 health crisis. The "danger to the community" analysis, however, does not stop there. The Court must take into consideration whether Davis himself poses a danger to the community such that releasing him would be more dangerous than keeping him detained. *See United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement..."); *see also United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop...A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis.").

As evidence of Davis's danger to the community, the government points to his alleged drug dealing and his unlawful sale of firearms to a confidential informant over a six-month period last year. These are serious allegations, and the alleged conduct presents a danger to the community. However, rare is the case in which there will be no evidence of danger to the community based on alleged criminal conduct. The plain language of the statute requires the Court to evaluate the "nature and seriousness of the danger." This language makes clear that there are different types of dangers and varying levels of seriousness. Selling narcotics, for example, is different than identity theft, which is different than carjacking. Having identified the specific nature of the danger and how serious it is, the Court then must consider available release conditions that will address those concerns

and "reasonably assure" the safety of the community. The statute requires "reasonable assurance," not a "guarantee." *United States v. Orta*, 760 F.2d 887, 891–92 (8th Cir. 1985). At times, there will be no such conditions. Here, there are.

***6** Davis has no prior criminal convictions and no history of violence. The government agrees that he did not engage in violent acts during the period of alleged criminal conduct. The government's concerns about danger to the community if he were released – that he would return to dealing drugs and selling firearms unlawfully – can be addressed with release conditions. With these conditions in mind, the Court finds that Davis's continued incarceration poses a greater risk to community safety than his release. *See Harris*, 2020 WL 1482342, at *1 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions."); *United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community" because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (finding that Ramos's "continued detention poses a risk of danger to himself and others").

With respect to flight, the Court finds that the government has not shown by a preponderance that Davis poses a risk of non-appearance. He has strong ties to Baltimore. His entire family lives here. He has lived here his entire life. He does not have a passport and has never traveled out of the country. When he has been ordered to appear in court on charges in the past, he has complied with the court's orders. Additionally, the pandemic has significantly curtailed travel throughout the region, including through Governor Hogan's order today that all Marylanders stay at home, providing additional assurance that Davis would not leave the area even if he had the financial resources to do so. *See Ramos*, 2020 WL 1478307, at *1 ("[T]he court finds that the circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial...").

The Court has considered the arguments and proffers of counsel, the Pretrial Services Report, and the publicly available information about COVID-19. Having applied them to the factors in the Bail Reform Act, the Court finds that there are conditions that will reasonably assure Davis's appearance in court and the safety of the community. Davis must reside at his girlfriend's home in Baltimore. She will serve as his third-party custodian.[8] He is confined to the residence except for medical appointments, meetings with counsel, court appearances, and other activities specifically approved by the Court and as pre-approved by Pretrial Services. Davis also must comply with all directives from federal, state, or local government pertaining to public health, including COVID-19. Pretrial Services should monitor his compliance with home confinement through location monitoring technology it deems appropriate. Davis may not use any controlled dangerous substances or illegal narcotics; he must attend substance abuse and mental health evaluation and counseling, if deemed appropriate by Pretrial Services; and he must submit to drug testing. Every condition of release is identified in the Order Setting Conditions of Release, ECF No. 20. Defense counsel should review the release order with his client, have Davis and his third-party custodian sign it acknowledging the conditions and consequences of a failure to abide by them, and submit a signed copy to the Court as soon as practicable.

## Access to Counsel

***7** The Bail Reform Act does not address the extent to which pretrial detention may interfere with the attorney-client relationship. In ordinary times, the Court would not address it either. But these are not ordinary times. The current public health crisis has upended the world as we know it. It has dramatically altered and limited our interactions with family, friends, co-workers, and members of our community. And it will similarly alter and limit a defendant's interaction with his attorney – especially if the defendant is detained pending trial.[9]

Because of COVID-19 concerns, CDF has eliminated contact meetings with counsel. Instead, counsel may meet with their clients in visitation booths traditionally used for non-contact family visits. In these booths, the defendant and his attorney are separated by plexiglass and must use a phone to communicate. CTF has not eliminated contact visits with counsel; attorneys are still permitted to meet with their clients in the attorney-client meeting rooms.

Both arrangements pose myriad challenges for the lawyer, the defendant, and the attorney-client relationship. As a general matter, attorneys may not want to enter any of the detention facilities out of fear for their and their family's health. They also may not want to risk unwittingly carrying the virus into the facilities and transmitting it to their clients, other detainees, or jail employees. Attorneys will be even more deterred from visiting a client now that five detainees at CTF have tested positive for COVID-19. For those attorneys who do venture into the facilities during this public health crisis, they do so at their own risk.

If an attorney does not visit his client at the jail, his only means of communication is by telephone and U.S. mail. The various technological alternatives to in-person meetings that many of us have taken advantage of during this crisis – FaceTime and Zoom, for example – are unavailable to incarcerated people. Even if these means of communication were an available option, there is no substitute for a face-to-face, in-person, contact meeting between an attorney and his client.

The disruption to the attorney-client relationship caused by this public health crisis likely will have broader implications for the Court and the administration of justice. If attorneys cannot regularly have meaningful in-person meetings with their clients, regularly review discovery with them, or thoroughly advise them about the consequences of going to trial, the number of jury trials may increase. This will strain Court and prosecutorial resources and may result in unnecessarily longer prison sentences. The extent of the disruption of the attorney-client relationship and the strain on the Court depends on how long this crisis lasts and how many people are detained pending trial. Even though access to counsel is not a specified factor in the Bail Reform Act, the Court has considered it in its decision.

## Conclusion

*8 In conclusion, the Court finds that there is a combination of conditions that will reasonably assure Davis's appearance as required and the safety of the community. Those conditions are identified in the accompanying Order Setting Conditions of Release, ECF No. 20. The government's motion for pretrial detention is denied.

March 30, 2020 /S/

Date Deborah L. Boardman United States Magistrate Judge

March 25, 2020

Hon. Larry Hogan

Governor of Maryland

Annapolis, MD
Dear Governor Hogan:

We are writing as faculty members of the Johns Hopkins Bloomberg School of Public Health, School of Nursing and School of Medicine to express our urgent concern about the spread of COVID-19 in Maryland's prisons, jails, and juvenile detention centers. As you know, COVID-19 is highly contagious, difficult to prevent except through social distancing, and especially dangerous to individuals over age 60 or with a chronic disease. Moreover, recent data suggest that the virus can remain on surfaces for up to 72 hours, thus rendering social distancing less effective in circumstances where the virus is present.

Jails, prisons, detention facilities and other closed settings have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, influenza, MRSA (methicillin resistant staph aureus), and viral hepatitis. Several deaths were reported in the US in immigration detention facilities associated with ARDS (acute respiratory distress syndrome) following influenza A, including a 16 year old immigrant child who died of untreated ARDS in custody in May 2019. ARDS is the life-threatening complication of COVID-19 disease and has a 30% mortality given ideal care. A correctional officer in New York has also died of the disease.

The close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely. Soap and hand sanitizers are not freely available in some facilities. Hand sanitizers like Purell, are banned in many facilities, because they contain alcohol. Further, for incarcerated individuals who are infected or very sick, the ability properly to treat them and save their lives is very limited. Testing kits are in short supply, and prisons and jails have limited options for proper respiratory isolation.

A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical

complications of COVID-19 and other infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilets, showers, and eating environments and limited availability of hygiene and personal protective equipment such as masks and gloves in some facilities. The high rate of turnover and population mixing of staff and detainees also increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

These populations are also at additional risk, due to high rates of chronic health conditions; substance use; mental health issues; and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after COVID-19 infection, and to death. Given that Maryland prisons, jails, and juvenile detention centers incarcerate high numbers of marginalized populations and African Americans will be disproportionately affected by these risks.

**\*9** Prison, jail, and detention center staff may bring the virus into the facility and are also at risk of acquisition from infected incarcerated individuals. Once infected, staff may also transmit the virus back into the communities and to their families. As jail, prison, and detention center health care staff themselves get sick with COVID-19, workforce shortages will make it even more difficult to adequately address all the health care needs in facilities.

Every effort should be made to reduce exposure in jails and other detention facilities, and we appreciate the efforts thus far of administrators toward this goal. To ensure that there are no impediments for inmates to come forward when sick, health care must be available to inmates without co-pays. But there should also be efforts to reduce the state prison population as well. It may be extremely difficult, however, to achieve and sustain prevention of transmission in these closed settings and given the design feature of the facilities. Moreover, lockdowns and use of solitary confinement should not be used as a public health measure, both because they have limited effectiveness and because they are a severe infringement of the rights of incarcerated people. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

Treatment needs of infected incarcerated individuals also need to be met, including expanded arrangements with local hospitals. It is essential that these facilities, which are public institutions, be transparent about their plans for addressing COVID-19. Such transparency will help public health officials and families of incarcerated people know what facilities are doing, and it also can help jurisdictions across the state share information and best practices. Other counties across the country have shared their action plans with the public and Maryland should follow these examples.

We therefore urge you to take the following steps:

1. Require correctional facility administrators to make their plans for prevention and management of COVID-19 in their institutions publicly available, as the San Francisco Sheriff's Department has done. Protocols should be in line with national CDC guidance. Frequently updated recommendations and model protocols are available from the National Commission on Correctional Health Care (https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections)

2. Ensure that intake screening protocols are updated to include COVID-specific questions.

3. Ensure the availability of sufficient soap and hand sanitizer for incarcerated individuals without charge; restrictions on alcohol (in hand sanitizers) should be suspended.

4. Implement other precautions to limit transmission within prisons and jails without relying on widespread use of lockdowns and solitary confinement. Additional precautions jointly issued by the Vera Institute of Justice and Community Oriented Correctional Health Services are available at https://cochs.org/files/covid-19/covid-19-jails-prison-immigration.pdf

5. Consider pre-trial detention only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, or parole or probation violations, should be prioritized for release. No one in these categories should be sent to jail

6. Expedite consideration of all older incarcerated individuals and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) for parole or other form of release from prison, with alternative forms of supervision and with supports in the community once released. Clemency power and expanded authority in Maryland law for administrative parole should be employed.

*10 7. Invest in increased resources for discharge planning and re-entry transitions to facilitate prison release of people under these revised policies.

8. Arrange for COVID-19 testing of incarcerated individuals and correctional facility workers who become ill.

9. Cease any collection of fees or co-pays or medical care.

10. Seek a Medicaid 1135 waiver to enable hospitals to provide an appropriate level of care to incarcerated individuals who are sick. See https://cochs.org/files/medicaid/COVID-19-Justicie-Involved-1135-Waiver.pdf

This pandemic is shedding a bright light on the extent of the connection between all members of society: jails, prisons and other detention facilities are not separate, but are fully integrated with our community. As public health experts, we believe these steps are essential to support the health of incarcerated individuals, who are some of the most vulnerable people in our society; the vital personnel who work in prisons and jail; and all people in the state of Maryland. Our compassion for and treatment of these populations impact us all.

Thank you very much.

*This letter represents the views of the following signatories, and do not necessarily reflect the views of The Johns Hopkins University*

Sincerely,

Patricia Davidson, Dean

Johns Hopkins School of Nursing

Joshua Sharfstein, Vice Dean for Public Health Practice and Community Engagement Johns Hopkins Bloomberg School of Public Health David Celentano, Chair

Department of Epidemiology

Johns Hopkins Bloomberg School of Public Health

David Peters, Chair

Department of International Health

Johns Hopkins Bloomberg School of Public Health

Colleen Barry, Chair

Department of Health Policy & Management

Johns Hopkins Bloomberg School of Public Health

Rajiv Rimal, Chair

Department of Health, Behavior and Society

Johns Hopkins Bloomberg School of Public Health

Marsha Wills-Karp, Chair

Department of Environmental Health and Engineering Johns Hopkins Bloomberg School of Public Health

Karen Bandeen-Roche, Hurley Dorrier Professor & Chair Department of Biostatistics

Johns Hopkins Bloomberg School of Public Health

M. Daniele Fallin, Chair

Department of Mental Health

Johns Hopkins Bloomberg School of Public Health

Jeffrey Kahn, Andreas C. Dracopoulos Director Johns Hopkins Berman Institute of Bioethics.

Leonard Rubenstein, Senior Scientist

Department of Epidemiology

Johns Hopkins Bloomberg School of Public Health

Carolyn Sufrin, Assistant Professor

Department of Gynecology and Obstetrics

Johns Hopkins School of Medicine

Susan Sherman, Professor

Department of Health, Behavior and Society

Johns Hopkins Bloomberg School of Public Health

Chris Beyrer, Desmond Tutu Professor of Public Health and Human Rights Department of Epidemiology Johns Hopkins Bloomberg School of Public Health

Gabriel Eber, Senior Associate

Department of Epidemiology

Johns Hopkins Bloomberg School of Public Health
cc: Robert Greene, Secretary of Department of Public Safety and Correctional Services

David Blumberg, Chair, Maryland Parole Commission Sam Abed, Secretary, Department of Juvenile Services
For additional signature please see below

Carl Latkin, Professor Caleb Alexander, Practicing General Internist David Dowdy, Associate Professor Department of Health, Behavior and Society Department of Epidemiology Department of Epidemiology Johns Hopkins School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Stefan Baral, Associate Professor Heather McKay, Assistant Scientist Andrea Wirtz, Assistant Scientist Department of Epidemiology Department of Epidemiology Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Amal Wanigatunga, Assistant Scientist Renee M. Johnson, Associate Professor Lorraine T. Dean, Assistant Professor Department of Epidemiology Department of Mental Health Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Curtis Meinert, Professor Emertius Corinne Joshu, Associate Professor Moyses Szklo, Professor Department of Epidemiology Department of Epidemiology Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Alden L. Gross, Associate Professor Allison McFall, Research Associate Colleen Hanrahan, Assistant Scientist Department of Epidemiology Department of Epidemiology Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Josef Coresh, Professor Antonio J. Trujillo, Associate Professor Sarah Murray, Assistant Professor Department of Epidemiology Department of International Health Department of Mental Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Li-Ching Lee, Senior Scientist Courtland Robinson, Associate Professor Nancy Glass, Professor Department of Epidemiology Department of International Health Johns Hopkins School of Nursing Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Yusra Shawar, Assistant Scientist Maria Merritt, Associate Professor Hannah Tappis, Associate Faculty Department of International Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Alan Regenberg, Associate Faculty Andrew Azman, Assistant Scientist Tener Goodwin Veenema, Professor

Johns Hopkins Berman Institute of Bioethics Department of Epidemiology Johns Hopkins School of Nursing Johns Hopkins Bloomberg School of Public Health

Amelia Buttress, Assistant Scientist Katherine Smith, Professor Ju Nyeong Park, Assistant Scientist Department of Health, Behavior, and Society Department of Health, Behavior, and Society Department of Health, Behavior, and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Sean Allen, Assistant Scientist Carol Underwood, Assistant Professor Zoé Hendrickson, Assistant Scientist Department of Health, Behavior, and Society Department of Health, Behavior, and Society Department of Health, Behavior, and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Jennifer L. Glick, Assistant Scientist Graham Mooney, Associate Professor Janet Holbrook, Professor Department of Health, Behavior, and Society Department of Epidemiology Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Johns Hopkins School of Medicine

Stella Babalola, Associate Professor Margaret E. Ensminger, Professor Elizabeth Hazel, Assistant Scientist Department of Health, Behavior, and Society Department of Health, Behavior, and Society Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Safia Jiwani, Research Associate Angela KC, Associate Faculty Kawsar Talaat, Assistant Professor Department of International Health Johns Hopkins Center for Global Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Seema Subedi, Research Associate Linnea Zimmerman, Assistant Professor Henry Perry, Senior Scientist Department of International Health Department of Population, Family, and Department of International Health Johns Hopkins Bloomberg School of Public Health Reproductive Health Johns Hopkins Bloomberg School of Public Health

Johns Hopkins Bloomberg School of Public Health

Alain Labrique, Associate Professor Jean H. Humphrey, Professor Joanne Katz, Professor Department of International Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Cyrus Engineer, Associate Chair Priyanka Agrawal, Research Associate Daniela C. Rodriguez, Associate Scientist Academic Programs Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Talata Sawadogo-Lewis, Research Associate Lara Ho, Associate Faculty Sara Benjamin-Neelon, Associate Professor Department of International Health Department of International Health Department of Health, Behavior, and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Rupali J. Limaye, Associate Scientist Shaun Truelove, Assistant Scientist Matthew Fentress, Associate Faculty Department of International Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Caroline Moreau, Associate Professor Pamela Surkan, Associate Professor Svea Closser, Associate Professor

Department of Population, Family, and Department of International Health Department of International Health Reproductive Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Melissa A. Marx, Assistant Professor Susan Rifkin, Senior Associate Jean C. Sack, Associate Faculty Department of International Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Ummekulsoom Lalani, Research Associate Jessica Atwell, Assistant Scientist Swetha Manochar, Associate Faculty Department of International Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

S. Wilson Beckham, Assistant Scientist Amita Gupta, Professor Henry Kalter, Associate Faculty Department of Health, Behavior, and Society Johns Hopkins School of Medicine Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Allison Jeffery, Associate Faculty Janice Bowie, Professor Yunhee Kang, Assisant Scientist Department of International Health Department of Health, Behavior, and Society Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Gulam Kibria, Associate Faculty Lori Heise, Professor Rebecca Heidkamp, Assistant Scientist Department of International Health Department of Population, Family,

and Department of International Health Johns Hopkins Bloomberg School of Public Health Reproductive Health Johns Hopkins Bloomberg School of Public Health

Johns Hopkins Bloomberg School of Public Health

Justin Mayhew, Research Associate Jennifer Lee, Research Associate Cesar Ugarte-Gil, Associate Faculty Department of International Health Department of Epidemiology Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Sabriya Linton, Assistant Professor Amber Mehmood, Assistant Scientist Peter Winch, Professor

Department of Mental Health Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Dustin Gibson, Assistant Scientist Melissa Davey-Rothwell, Associate Scientist Kathleen Norton, Administrative Director Department of International Health Department of Health, Behavior, and Society Johns Hopkins Center for American Indian Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Tamar Mendelson, Professor Candelaria Vergara Coggiano, Assistant Scientist Anna Durbin, Professor Department of Mental Health Department of Epidemiology Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Johannes Thrul, Assistant Professor Kristin Mmari, Associate Professor Ashley Sheffel, Assistant Scientist

Department of Mental Health Department of Population, Family, and Department of International Health Johns Hopkins Bloomberg School of Public Health Reproductive Health Johns Hopkins Bloomberg School of Public Health

Johns Hopkins Bloomberg School of Public Health

Hanna Pickard, Bloomberg Distinguished Professor William Robert Brieger, Professor Kristen Hurley, Associate Professor Department of Philosophy Department of International Health Department of International Health Berman Institute of Bioethics Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Judith Bass, Associate Professor Halida Akhter, Senior Associate Nicholas Reed, Assistant Professor

Department of Mental Health Department of International Health Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Alan Scott, Professor John Jackson, Assistant Professor Hima Patel, Research Associate Department of Molecular Microbiology and Department of Epidemiology Department of International Health Immunology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Donatella Massai, Senior Researcher Robin McKenzie, Associate Professor of Medicine Michelle Colder Carras, Associate Professor Department of International Health Johns Hopkins University School of Medicine Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

David A Sack, Professor Harsha Rajashekharaiah, Research Associate Ann Yelmokas McDermott, Associate Scientist Department of International Health Department of International Health, Center for Department of International Health Johns Hopkins Bloomberg School of Public Health Humanitarian Health Johns Hopkins School of Public Health

Johns Hopkins Bloomberg School of Public Health

Hilary Bok, Associate Professor, Philosophy Kate Wright, Research Associate Cui Yang, Assistant Professor Berman Institute of Bioethics Department of International Health Department of Health, Behavior and Society Krieger School of Arts and Sciences Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Alexa Edmier, Associate Faculty Rebecca Fix, Assistant Scientist Smisha Agarwal, Assistant Professor Department of International Health Department of Mental Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Michelle Kaufman, Assistant Professor Alene Kennedy-Hendricks, Assistant Scientist Stephen Tamplin, Associate Scientist Department of Health, Behavior and Society Department of Health Policy and Management Department of Health, Behavior, and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public He

Sara Bennett, Professor Adam Koon, Assistant Scientist Nancy Kass, Vice-Provost and Professor of Bioethics and Department of International Health Department of Mental Health Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins University and Bloomberg School of

Public Health

Hojoon Sohn, Assistant Scientist Vidhi Maniar, Research Associate Keith West, Professor Department of Epidemiology Department of International Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Li Liu, Associate Professor Melinda Munos, Assistant Professor Alain Koffi, Assistant Scientist Department of Population, Family and Department of International Health Department of International Health Reproductive Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Terrinieka Powell, Associate Professor Sarah Dalglish, Associate Professor Ghassan Hamra, Assistant Professor Department of Population, Family and Department of International Health Department of Epidemiology Reproductive Health Johns Hopkins School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Keri Althoff, Associate Professor Kathleen Page, Associate Professor Elizabeth Stuart, Professor Department of Epidemiology Johns Hopkins School of Medicine Departments of Mental Health, Biostatistics, and Health Johns Hopkins School of Public Health Policy and Management

Johns Hopkins Bloomberg School of Public Health

Beth McGinty, Associate Professor Shruti Mehta, Professor Yeeli Mui, Assistant Professor Department of Health, Policy and Management Department of Epidemiology Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Alex McCourt, Assistant Scientist Eric Bass, Professor of Medicine Karin Tobin, Associate Professor Department of Health Policy & Management Johns Hopkins University School of Medicine Department of Health, Behavior and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Lilly Engineer, Assistant Professor Elizabeth Skinner, Senior Scientist Philip Anglewicz, Associate Professor Department of Health Policy and Management Department of Health Policy and Management Department of Population, Family and Reproductive Johns Hopkins School of Medicine and Bloomberg Johns Hopkins Bloomberg School of Public Health Health School of Public Health Johns Hopkins Bloomberg School of Public Health

Jennifer Wolff, Professor Joanne Rosen, Senior Lecturer Tricia Aung, Research Associate Department of Health Policy and Management Department of Health Policy and Management Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Sachini Bandara, Assistant Scientist Hossein Zare, Assistant Scientist Mark Van Natta, Associate Scientist Department of Health Policy and Management Department of Health Policy and Management Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Daniel Webster, Bloomberg Professor of American Danielle German, Associate Professor Cassandra Crifasi, Assistant Professor Health Department of Health, Behavior and Society Center for Gun Policy and Research Department of Health Policy and Management Johns Hopkins Bloomberg School of Public Health Department of Health Policy and Management Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Emily Gurley, Associate Scientist Jonathan Golub, Professor Subhra Chakraborty, Associate Scientist

Department of Epidemiology Department of Medicine, Epidemiology, and Department of International Health Johns Hopkins Bloomberg School of Public Health International Health Johns Hopkins Bloomberg School of Public Health

Johns Hopkins Bloomberg School of Public Health

Michael Rosenblum, Associate Professor Haneefa Saleem, Assistant Professor Amy Knowlton, Professor Department of Biostatistics Department of International Health Department of Health, Behavior and Society Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Neha Shah, Research Associate Trang Nguyen, Assistant Scientist Ingo Ruczinski, Professor Department of International Health Department of Mental Health Department of Biostatistics Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Krystal Lee, Research Associate Elizabeth Letourneau, Professor Chiara Altare, Assistant Scientist

Department of Health, Behavior and Society Department of Mental Health Department of International Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

William W Eaton, Professor Diana Yeung, Research Associate Jia Ahmad, Research Associate Department of Mental Health Department of International Health Department of Health Policy and Management Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Sheppard G. Kellam, Professor Emeritus Sarah Polk, Assistant Professor Kathleen Page, Associate Professor Department of Mental Health Centro SOL, Johns Hopkins School of Medicine Johns Hopkins School of Medicine Johns Hopkins Bloomberg School of Public Health Corinne Keet, Associate Professor Rachel Chan Seay, Assistant Professor Amanda Latimore, Assistant Scientist

Johns Hopkins School of Medicine Department of Gynecology and Obstetrics Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins School of Medicine Johns Hopkins Bloomberg School of Public Health

Avonne Connor, Assistant Professor Gail Geller, Professor Noel Mueller, Assistant Professor Department of Epidemiology Department of Medicine Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins University School of Medicine Johns Hopkins School of Public Health

Berman Institute of Bioethics

Michele Decker, Associate Professor Becky Genberg, Assistant Professor Cecilia Tomori, Director of Global Public Health and Department of Population, Family and Department of Epidemiology Community Health Reproductive Health Johns Hopkins Bloomberg School of Public Health Johns Hopkins School of Nursing Johns Hopkins Bloomberg School of Public Health

Anne Burke, Associate Professor Anthony D. So, Professor of the Practice Baldeep Dhaliwal, Research Associate Department of Gynecology and Obstetrics Department of International Health Department of International Health Johns Hopkins School of Medicine Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Shea Littlepage, Research Associate Julie Denison, Associate Professor Joseph Carrese, Professor Department of International Health Department of International Health Johns Hopkins School of Medicine Johns Hopkins Bloomberg School of Public Health Johns Hopkins Bloomberg School of Public Health

Julie Evans, Research Associate Sheree Schwartz, Assistant Scientist Timothy Shields, Associate Scientist Department of Health, Behavior and Society Department of Epidemiology Department of Epidemiology Johns Hopkins Bloomberg School of Public Health Johns Hopkins School of Public Health Johns Hopkins Bloomberg School of Public Health

Paul Spiegel, Professor

Department of International Health

Johns Hopkins Bloomberg School of Public Health

**All Citations**

Slip Copy, 2020 WL 1529158

## Footnotes

1. Davis, counsel, and the Pretrial Services Officer participated in the hearing by telephone. After consultation with counsel, Davis consented to the audio hearing. This procedure was authorized by Congress and has been adopted by this Court. *See In Re: Video Teleconferencing for Criminal Proceedings Under CARES Act*, Misc. No. 00-308, Standing Order 2020-06. These procedures are necessary to preserve the health and well-being of the participants in the hearing and the community. *See In Re: Court Operations Under the Exigent Circumstances Created by COVID-19*, Misc. No. 00-308 (Mar. 20, 2020).

2. *See also United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The risk of the spread of the virus in the jail is palpable...."); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible for a medically vulnerable inmate...to isolate himself in [an] institutional setting as recommended by the CDC.").

3. The daily flow of human traffic includes correctional officers, kitchen workers, administrative staff, attorneys, and newly admitted pretrial detainees who were recently in the community or in another jail or prison.

4. Governor Hogan announced yesterday that Maryland "will be looking more like New York" around Easter, which is less than two weeks away. If that is the case, the COVID-19 outbreak in New York City's jails should be considered, even if the comparisons are not perfect. During the week of March 15, the New York Department of Corrections reported 21 cases of COVID-19 in inmates. Today, about two weeks later, it has been reported that 167 New York City inmates and 114 city corrections staff members at Riker's Island have tested positive. Additionally, here in Maryland, the Clifton T. Perkins Hospital Center, Maryland's maximum-security state psychiatric hospital, reported today that several patients have tested positive for COVID-19, and the Maryland state prisons have reported their first case.

5. Even if Davis were at a jail where there have not yet been reports of positive tests, the "danger to the community" analysis still would apply. Public health officials and experts have not advised us to wait until the virus is found in a facility before we act. Rather, they urge us to take preventative steps to avoid, stem, or curtail the crisis. The most important step we can take is to reduce the detainee population when possible, regardless of whether the virus has been detected in the facility.

6. *Cf. United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Though the BOP has admirably put transmission mitigation measures in place...in the event of an outbreak at the Metropolitan Correctional Center...substantial medical and security challenges would almost certainly arise.").

7. The government argues that the pretrial detention facilities are equipped to handle the situation. The institutional efforts cited by the government include increased sanitation and hygiene, elimination of family visits, training of correctional officers, screening new inmates for symptoms, and quarantining inmates if necessary. ECF No. 17 at 5–7. These measures are important. However, they do not prevent the virus from entering the facilities, and they do not enable social distancing. Moreover, the Court agrees with the Hopkins experts that pretrial facilities are not equipped to provide the necessary medical care.

8. At the hearing, the government raised concerns about the third-party custodian. The Court agrees that Davis's girlfriend is not an ideal custodian, but the Court finds her suitable under these circumstances. She is 33 years old, has two minor children, and lives in Baltimore. She works as a pizza delivery driver five nights a week. She is willing to have Davis live in her home and serve as a third-party custodian. She appeared at the detention hearing by telephone. She has a dated criminal history of drug charges when she was younger, but she completed drug treatment and has no recent charges. The Court finds that she is suitable, particularly in light of Davis's compliance with prior court-ordered conditions, lack of criminal history, and the location monitoring release condition.

9. Counsel for Davis did not raise the access to counsel issue as a basis for release. However, counsel in another matter before the Court today provided an email exchange from March 24 and 25 in which a CTF staff member told him that "due to the increase of legal call requests, there will be a delay in processing legal calls. Diligent efforts are being made to accommodate everyone's request under these circumstances. The case manager/supervisor cc'd on this email will contact you for scheduling. Please Note: In-person legal visits are still allowed and the most frequently used option...Thank you for your understanding as we all are adjusting to the concerns of COVID-19." No legal call has been scheduled.