# EXHIBIT NO. 11

# SUPPLEMENTAL MEMORANDUM
### *UNITED STATES V. WEST*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| v. | * | **Criminal No. ELH 19-364 ELH** |
| **TERRELL WEST** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>DEFENDANT'S SUPPPLEMENT TO</u>
## <u>MOTION TO REOPEN DETENTION HEARING AND ORDER PRETRIAL RELEASE</u>

This morning the defense confirmed that Mr. West tested positive for the COVID-19 virus. The defense has been informed that he is in a unit at the Central Treatment Facility with one other individual who tested positive but defense counsel was not permitted to speak with Mr. West. The government has opposed motions for release from custody in similar cases by arguing that the threat of COVID-19 at local pretrial detention facilities is only hypothetical. That argument is no longer tenable. As could easily have been predicted, individuals are now testing positive in pretrial detention facilities. Mr. West is one of them. The defense seeks Mr. West's immediate release from custody for his own safety and for the safety of the other inmates in custody at CTF, jail staff, and the community at large.

The fact that Mr. West has been infected demonstrates the failure of the D.C. Department of Corrections (DDOC) to address the threat the virus poses to men and women being held in its facilities. There is no basis to believe that the DDOC can now be trusted to keep Mr. West safe and healthy. Several judges in the United States District Court for the District of Columbia, who know the conditions and services offered at D.C. Jails well, have ordered release of federal criminal defendants based upon the serious safety concerns raised by the coronavirus pandemic. This Court

should follow suit. Mr. West should be permitted to go to the home of his aunt where he can self-quarantine with access to appropriate care, hygiene, and isolation from others.

**I.     Conditions at D.C. Department of Corrections Facilities are Unsafe**

It should come as no surprise that Mr. West tested positive given that the DDOC's operations fall far short of preventative measures recommended by the CDC.[1]

- The CDC recommends that there is a "sufficient stocks of hygiene supplies, cleaning supplies, PPE [Personal Protective Equipment], medical supplies" with a "plan in place to restock as need if COVID-19 transmission occurs."

  *DDOC General Counsel, Eric Glover, was unable to provide a list of supplies currently in stock—including PPE, testing materials, and cleaning supplies—and was unable to specify when necessary equipment would be arriving.*[2]

- The CDC recommends that a no-cost supply of soap be provided to incarcerated persons. If bar soap is provided, ensure that it does not irritate the skin so as to discourage frequent hand washing.

  *DDOC has not yet indicated that individuals will have ready and continual access to soap at no cost.*

- The CDC recommends that employers establish a "respiratory protection program" so that individuals are "fit tested for any respiratory protection they will need within the scope of their responsibilities"

  *There is no evidence that DDOC has fit tested staff and inmates on work details.*

- The CDC recommends that staff and incarcerated individuals are trained to correctly attire and dispose of PPE they will need to use.

  *DDOC has not confirmed that staff and impacted individuals have been trained on proper use and disposal of PPE gear.*

---

[1] CDC, Interim Guidance on Management of COVID-19, last updated March 23, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities.

[2] Mr. Glover participated in a Bond Review Motion on Monday, March 23, 2020 in front of Judge Ryan in D.C. Superior Court. *U.S. v. Edward Banks*, 2019 CF1 10956 (Ryan, J.).

2

- The CDC recommends social distancing as the primary preventative measure, with the following guidance:[3]

    o <u>Common Areas</u>: Enforce increased space between individuals in holding cells, in lines, and in waiting areas—such as intake—by removing every other chair.
    o <u>Recreation</u>: Choose recreation spaces where individuals can spread out and stagger times in recreation spaces
    o <u>Meals</u>: Stagger meals and rearrange seating so there is space between individuals or provide meals inside units
    o <u>Group Activities</u>: Limit the size of group activities and suspect group programs that require close contact.
    o <u>Medical</u>: Designate a room near each housing unit so that individuals can be evaluated without walking through the facility. If not possible, consider staggering sick call. Designate a room near the intake area to evaluate new entrants who have been flagged for displaying COVID-19 symptoms. Consider quarantining all new entrants for 14 days.

*DDOC has not confirmed that some version of each of these measures has been put into place. It is highly unlikely given the current population.*

- Promote non-contact visits.

*DDOC has been largely unable to facilitate legal calls with detained individuals. DDOC staff report being overwhelmed by the number of requests, told attorneys at the Federal Public Defender Office as of March 26 that they could no longer arrange legal calls, and have told attorneys that in-person visits are preferred.*

- To ensure proper isolation procedures, individuals with COVID-19 symptoms should be housed separately from confirmed cases. To the extent possible, these individuals should be housed in individual cells and should not comingle with other individuals suspected of having COVID-19. The CDC provides a comprehensive guide to quarantine procedures.

*DDOC's quarantine policies have not been made available to review.*

Contrary to the picture DDOC has attempted to paint of the steps it is taking to prepare for COVID-19, the reality—based on firsthand reports—is that DDOC is failing to protect incarcerated people on multiple fronts[4]:

---

[3] These recommendations have been reproduced almost verbatim from the CDC's guidance online. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities.

[4] It is important to recognize how little control the United States Marshal Service has over conditions at DDOC facilities as well as the scarce information available to the United States Marshal Service about current conditions

3

- Lack of Testing. Individuals in DDOC facilities who have exhibited symptoms, including coughs, shortness of breath, and chest pains have not been tested, nor in some cases even seen by medical professionals. On March 23, 2020, Deputy Mayor Kevin Donahue announced that only one person at the D.C. Jail has been tested for COVID-19. Yet reports have been made of individuals who are currently detained seeking medical attention for COVID-19 symptoms but not being tested. For instance, at CTF, on March 20, 2020, an individual with a cough, chest pains, and chills was seen by medical staff who also found that he had a fever, but still did not administer a COVID-19 test. Instead, the medical staff told him he did not have COVID-19, with no explanation as to how they had come to that conclusion without a test. The individual was returned to his unit, risking not only his health, but the health of the rest of his unit and those who will continue to come in contact with him, including DDOC staff members, Unity Health medical staff, and the families and household members of people who work at CTF. On March 23, 2020, one unit at D.C. Jail reportedly had at least 20 people who were sick, none of whom had been placed in quarantine. On March 24, 2020, another unit was reported to have three people with difficulty breathing, severe coughs, and worsening symptoms. Of those three, only one received treatment, and none were tested for COVID-19. The first individual at CTF who tested positive had only been placed in a single occupancy cell five days prior to his positive test and had been in a double occupancy cell prior to that, meaning that he exposed a number of other residents to the virus who are likely now infected.

- Incarcerated Individuals Do Not Have Adequate Access to Medical Attention. Even people exhibiting symptoms of COVID-19, including shortness of breath, coughs, and chest pains, are not being taken to the medical unit in a timely way. Individuals detained in DDOC custody report that there is at least a 24-hour delay—and sometimes a delay as long as a week—between the time when an individual seeks medical attention for symptoms, and when that request is even seen by a medical professional, much less if or when treatment is provided. The process for requesting medical care in DDOC custody is to submit a written request through the case manager on the residential unit, who then passes that request on to the medical team. Absent an acute emergency, such as loss of consciousness, an individual cannot be assessed by the medical staff without making a written request, waiting for the case manager to forward the request, waiting for the medical staff to respond, and then waiting for an available medical appointment. Those procedures have not been altered since COVID-19 began appearing in the D.C. metropolitan area, and no special expedited medical review is provided for individuals reporting symptoms consistent with COVID-19. Throughout the process of waiting for medical attention, the individual remains in his assigned residential unit, sharing living quarters with others, without protective equipment to prevent the spread of any viral particles transmitted by breathing or touching surfaces. The individual is not permitted to self-quarantine pending

---

within the facilities. Unlike the Chesapeake Detention Facility in Baltimore, the Marshals do not have a liaison within the DC Jail or CTF. The Marshals have been relying upon information from the DDOC General Counsel's Office for details about who has been tested, who is in quarantine, and who has tested positive. The undersigned was able to confirm that Mr. West tested positive after making repeated calls to the CTF medical office today. As of this afternoon, the Marshals had not yet been told that Mr. West tested positive and they were still attempting to learn who the positive test was.

4

medical assessment. Given the highly contagious nature of COVID-19, failing to quarantine symptomatic people in a timely manner and allowing them to continue to intermingle with others at the jail puts everyone in the facility at risk.[5] Between the time when someone asks to see a medical professional and the time they are actually seen, their condition could worsen or even become critical. Additionally, not all individuals detained at DDOC facilities are given flu shots. Those who have not been immunized are at higher risk of getting the flu and coronavirus at the same time, which dramatically increases the mortality risk. When this occurs, the DDOC facilities are not, and will not be, equipped to handle the situation. Not only is there a general lack of access to quality, efficient medical care, but also medical staff who lack the knowledge and skills to properly treat each patient individually. Patients at CTF, specifically, are treated by medical staff supervised by medical doctors, but who are themselves not doctors, much less infectious disease specialists, internists, pulmonologists, or emergency medical specialists.

- <u>People at DDOC Facilities are Not Given Tools for Proper Hygiene</u>. Individuals detained in DDOC facilities do not have uninhibited access to soap, water, tissues, or paper towels. Currently, there are varying practices for providing soap—some units have received soap and others have not. It is not clear that more soap will be provided when the initial bar runs out, which disincentives individuals from frequent hand washing. Additionally, upon information and belief, the DDOC facilities do not offer antiseptic soap, and generally do not even allow resident use of hand sanitizer. To the extent any hand sanitizer was available on certain CTF units, it has since been removed for exclusive use by staff.

Staff are not consistently wearing gloves or masks, including guards tasked with searching visitors and staff entering the facility. Staff have been seen coughing without covering their mouths. Staff have not been observed washing their hands with any greater frequency than before, despite regular announcements instructing detainees to wash their hands, and despite the fact that unlike the detainees, staff actually have access to soap to do so. DDOC staff have been observed conducting close-contact pat-down searches of incarcerated individuals without washing their hands, and without wearing gloves or masks to prevent the transmission of viral particles onto the person they are searching.

- <u>DDOC Facilities are Not Thoroughly Cleaned to Prevent the Spread of Disease</u>. Since COVID-19 reached the D.C. area, DDOC has not significantly increased the amount of cleaning occurring in its facilities. At most, common areas are cleaned a few times per day, often by the residents themselves. Unfortunately, it has been reported that on some units, cleaning supplies have run out and have not been replaced for days. On other units, residents are given *three to four wipes total*—not per person, but for the entire unit—to clean the common areas. Residents report that although they are aware that DDOC has cleaning supplies, possession of cleaning supplies in cells or at times other than specified cleaning times is punished as possession of contraband. On March 25, 2020, a Federal Public Defender Office client residing at the DC Jail reported that detainees have to order

---

[5] CDC, "Coronavirus Disease 2019 (COVID-19): How It Spreads" (March 7, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

5

soap off commissary and that they are only occasionally provided bars of soap; there is no access to hand sanitizer in his cell or unit, but here is some hand sanitizer in the hallways; and that 120 men in a tier are released to the same common area. On March 26, 2020, another Federal Public Defender Office client residing at CTF reported that there is no extra soap provided; that detainees are provided with watered down cleaning liquid to clean cells, rails, cell doors, microwaves, tabletops, sinks, while staff uses a bleach solution; staff and detainees are jointly responsible for the cleaning; phones are only wiped down 3 times per day and inmates are not given supplies to clean a phone before using them; and congregant recreation times and conditions are the same as always.

Concerns about conditions at DDOC facilities including the Correctional Treatment Facility are shared by the guards themselves. Counsel for the union that represents all D.C. Corrections officers wrote a letter to the Office of the Director of the D.C. Department of Corrections on March 25, 2020 documenting the serious concerns among D.C. corrections officers about the failure of the Department of Corrections to implement protections for inmates and corrections officers. That letter is attached hereto at Exhibit A. The letter indicates, among other things, that:

- There have been rumors that DDOC employees are planning a walkout or protest on the grounds of the Department of Corrections over its handling of the COVID-19 outbreak.

- Inmates coming into the Jail are not screened for symptoms of COVID-19.

- Corrections officers receiving and discharging inmates have no Personal Protective Equipment (PPE) despite the fact that they have direct contact with these inmates.

- Inmates continue to move within the jail. Inmates in the four restricted housing units must be escorted by hand by corrections officers who do not have PPE.

- Corrections officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units.

- Inmates are not required to engage in social distancing, hand-washing, or health monitoring and continue to engage in recreation in a common yard.

- Case workers meet with inmates in small offices with no PPE or other distancing measures.

- Corrections officers enter the jail three shifts per day. There is no distancing among staff and no attempt to obtain or record health concerns of each corrections officer.

- When 65 inmates were quarantined at D.C. Jail, guards were ordered to move them with only masks and gloves – but no gowns or other PPE equipment.

- The inmates who were "quarantined" were actually housed two to a cell and corrections officers on that unit were not provided any PPE.

In light of these countless failings, there is absolutely no basis to believe that the DDOC is now capable of caring for Mr. West or ensuring that he does not pass the virus on to other inmates or guards.

II. **The United States District Court for the District of Columbia Has Recognized that Release is Appropriate in Some Federal Criminal Cases Based Upon Concerns About COVID-19 at DDOC Facilities**

District and Magistrate Judges in the United States District Court for the District of Columbia are quite familiar with DDOC facilities because detainees in that District are typically housed in DDOC facilities. In recent weeks there have been a number of release orders in District of D.C. cases based upon health concerns in DDOC facilities raised by the coronavirus pandemic. Those release orders have come in cases where defendants had been previously detained, and many have come in cases with serious charges, including firearms, drug trafficking, and 18 U.S.C. § 924(c) counts. Some of those cases are summarized here:

- *United States v. McLean*, No. 19-cr-00380 RDM, Dkt. No. 21 (D.D.C. March 28, 2020) (granting emergency motion for release after earlier detention order in 18 U.S.C. § 922(g), 21 U.S.C. § 841(b)(1)(C), and 18 U.S.C. § 924(c) case based on COVID-19 threat where defendant is 55 years old and suffers from diabetes)

- *United States v. Harris*, No. 19-cr-00356-RDM, Dkt. No. 35 (D.D.C. March 27, 2020) (granting emergency motion for release pending sentencing in distribution of child pornography case based on COVID-19 threat)

7

- *United States v. Hutchings*, No. 19-cr-00361-BAH, Dkt. No. 41 (D.D.C. March 26, 2020) (setting conditions of release after earlier detention order in conspiracy to defraud United States case based on COVID-19 threat)

- *United States v. Jaffee*, No. 19-cr-0088-RDM (D.D.C. March 26, 2020) (setting conditions of release after earlier detention order in 18 U.S.C. § 922(g), 21 U.S.C. § 841(b)(1)(D), and 18 U.S.C. § 924(c) case based on weight of evidence and COVID-19 threat)

- *United States v. Walker*, No. 20-cr-00060-TFH, Dkt. No. 16 (D.D.C. March 20, 2020) (setting conditions of release on consent after earlier detention order in 18 U.S.C. § 922(g) case based on COVID-19 threat and defendant's medical condition)

- *United States v. Courtney*, No. 19-cr-00413-TJK, Dkt. No. 27 (D.D.C. March 20, 2020) (setting conditions of release on consent after earlier detention order in 18 U.S.C. § 922(g) case based on COVID-19 threat and defendant's "unique medical concerns")

- *United States v. Jones*, No. 19-cr-00362-CRC, Dkt. No. 15 (D.D.C. March 19, 2020) (setting conditions of release on consent after earlier detention order in threats against president case based on COVID-19 threat)

- *United States v. Nash*, No. 13-cr-00293-BAH, Dkt. No. 27 (D.D.C. March 16, 2020) (terminating supervised release and ordering immediate release from D.C. Jail in 18 U.S.C. § 922(g) case based upon COVID-19 threat where defendant is 64 and suffers from asthma and diabetes)

Other courts around the country have also recognized that more liberal standards for release are necessary to sufficiently reduce and protect the jail population. *See, e.g., United States v. Stephens*, 1:15-cr-00095 (AJN), Doc. No. 2798 (S.D.N.Y. Mar. 19, 2020) (acknowledging the changed circumstances from the defendant's initial detention determination included that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *United States v. Barkman*, 3:19-cr-0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (taking into account the COVID-19 pandemic to modify confinement as a probation condition and noting that "while measures are being taken by facilities all over the world, no facility is prepared… [the correctional facility] simply lacks the resources

8

necessary to engage in aggressive screening and testing of inmates, correctional staff, law enforcement officers and other care and service providers who enter the facility."); *In re. Extradition of Alejandro Toledo Manrique*, No. 19MJ71055MAG1TSH, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) (ordering release taking into account the "risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail" despite the jail facility's "detailed" management plan for COVID-19 and assertions that the facility had no confirmed COVID-19 cases); *United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (allowing the defendant to remain on pretrial release rather than remanding to the detention center while recognizing that "the more people we crowd into that facility, the more we're increasing the risk to the community.").

### III. Mr. West's Release is Necessary for his Own Safety and the Safety of Others

Mr. West should be permitted to be released to recover in the home of his aunt, where he can be kept separate from others and where he will be able to seek quality medical care should his condition deteriorate. There is no basis to believe that the Correctional Treatment Facility is equipped to offer Mr. West necessary treatment, including specialized medicine or a ventilator should he require one. Statistics reported by the CDC show that younger, healthier people can be susceptible and seriously impacted by COVID-19. Nearly 4 in 10 of the hospitalizations from coronavirus have occurred in patients under 55 years old."[6] In fact, young adults, between the ages of 20 to 44, comprise 20% of the population of individuals that needed to be hospitalized after

---

[6] *Nearly 40% of Hospitalizations in U.S. COVID-19 Cases Involve Adults Under 55*, U.S. News and World Report, March 19, 2020, https://www.usnews.com/news/health-news/articles/2020-03-19/nearly-40-37-of-hospitalizations-in-us-covid-19-cases-involve-adults-under-55

9

contracting the virus and 12% of the population in the ICU.[7] Therefore, it has been soundly disproven that individuals that do not present any of the risk factors will be largely unaffected by the virus.

Moreover, placement of Mr. West and others with the virus on a separate unit is not an adequate solution. Medical experts agree that placement in disciplinary segregation or solitary confinement is not an effective disease containment strategy. Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine, submitted an affidavit in another matter related to the coronavirus pandemic and its implications in detention facilities. Dr. Meyer explained that beyond the known detrimental mental health effects of solitary confinement, isolating people who are ill in solitary confinement is also an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff. Affidavit of Dr. Jaimie Meyer, ¶10, attached at Exhibit B. Correctional officers and correctional healthcare workers move in and out of the facilities and return to their families and to our communities at the end of their shifts, bringing back and forth to their families, their neighbors, and to incarcerated patients all exposures that they have had during their shift or at home.

In short, it is safer for other people in the jail, for the staff of the jail, and for the community well beyond that, if Mr. West is able to exercise self-protective measures in a sanitary, disinfected space with access to quality medical care. Release will both ensure his safety and reduce the risk

---

[7] *Young Adults Ages 20 to 44 Makes Up Nearly One-Third of U.S. Coronavirus Cases, CDC Says*, CBS News, last updated March 19, 2020, https://www.cbsnews.com/news/coronavirus-updates-young-people-ages-20-to-44-hospitalizations-20-percent-adults-spring-break-social-distancing/.

10

that he or anyone else transmits or receives the infections. For this and the reasons set forth in Mr. West's initial motion to reopen the detention hearing, Mr. West's continued detention at the D.C. Jail violates the Due Process Clause of the Fifth Amendment, and he should be immediately released with appropriate conditions.

                                              Respectfully submitted,

                                              JAMES WYDA
                                              Federal Public Defender
                                              for the District of Maryland

                                                      /s/
                                            _____
                                            NED SMOCK (#809226)
                                            Assistant Federal Public Defender
                                            6411 Ivy Lane, Suite 710
                                            Greenbelt, MD 20770
                                            Phone: (301) 344-0600
                                            Fax: (301) 344-0019
                                            Email: ned_smock@fd.org